**Sharon Cogburn McFARLIN, Plaintiff/Appellee,**

v.

**Thomas E. WATTS, Jr., Defendant/Third–Party Plaintiff/Appellant,**

v.

**Helen ROGERS and Jones & Rogers, Attorneys At Law, Third–Party Defendants/Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Oct. 26, 1994.

Permission to Appeal Denied by Supreme Court March 6, 1995.

Joseph Y. Longmire, Jr., Hendersonville, for plaintiff/appellee.

Thomas E. Watts, Jr., Nashville, pro se/defendant and third-party plaintiff/appellant.

Robert L. Trentham and Mark Tyler Seitz, Nashville, for third-party defendants/appellees.

## OPINION

CANTRELL, Judge.

A judgment creditor sued the debtor's lawyer for negligently misrepresenting that the judgment would be promptly paid from funds obtained in the settlement of another action. The Circuit Court of Sumner County entered a judgment for the plaintiff. For the reasons set out in this opinion we reverse the judgment below and dismiss the complaint.

### I.

Sharon McFarlin obtained a $9,999.99 judgment in the General Sessions Court of Sumner County against Jim and Rose Winfree. On September 17, 1992, she arrived at the Winfrees' door with a moving van and a deputy sheriff armed with an execution commanding him to levy on all the defendants' personal property, including home furnishings.

Tom Watts, a Nashville attorney, had represented the Winfrees in legal matters for several years. One of the matters involving Mr. Winfree was an action in federal court where Mr. Watts had obtained a judgment on behalf of a corporation in which Mr. Winfree had an interest. While this case was on appeal, the parties agreed to a compromise and settlement. Mr. Winfree's anticipated share of the settlement was enough to pay Ms. McFarlin's judgment. On September 16, 1992, the day before the attempted levy on the Winfrees' furniture, Mr. Watts received a letter from his adversary in the federal case enclosing the settlement forms and stating: "The settlement monies are to be wire-transferred into my trust account around the first of next week."

When the moving van arrived at Mr. Winfree's door, he asked Ms. McFarlin to talk to Mr. Watts about withdrawing the execution on the promise that the judgment would be paid out of the settlement of the federal case. Ms. McFarlin referred Mr. Watts to her attorney. When Mr. Watts tried to contact Ms. McFarlin's attorney, Mr. Longmire, and found he was out of the office, one of the attorneys in the office with Mr. Longmire took the call. This is his version of the conversation with Mr. Watts:

Q. And tell the Court what your memory of that telephone call was.

A. Well, Mr. Watts, there was a sense of real urgency with Mr. Watts because, as he related to me, his client had been a defendant in a detainer action, as I recall, or something, or a lawsuit, had lost, and the sheriff and a moving van were at his client's home, ready to take furniture out of his client's house. And, as I said, it was late on Thursday afternoon. And he was, Mr. Watts was trying to get some type of accommodation to prevent that from happening.

And he related to me that he had settled a lawsuit on behalf of his client, and that the proceeds in an amount to satisfy the judgment in excess of $10,000 would be immediately forthcoming.

Q. Now, is that a quote, or is that your best memory?

A. That's my best memory. I mean, this was a year and a half ago. That's as close a quote as I could come to. There was no mention whatsoever of an African defendant, of an assignment by Winfree against another plaintiff's loss of proceeds of default judgments or whatever.

I was led to believe it was a very simple lawsuit that Mr. Watts had settled himself, and he was going to be getting the money immediately, he said by that following Monday, which would be four days, but no later than the following Wednesday, which was five days.

And I was under the distinct impression, from talking to them, it was an insurance type case, where he was just waiting on the check from the insurance company, there would be no question about it.

Q. And what did he want you to do?

A. He wanted me to call Ms. McFarlin and ask Ms. McFarlin or persuade Ms. McFarlin to release the execution based upon his assurance that this money, this $10,000, would be forthcoming within three days and was, was a certainty.

And, you know, again, I didn't know any of the players in this lawsuit, and regret picking up the phone at this point in time, quite honestly.

Q. What did you do after that phone call, Mr. Jones?

A. Well, I'll tell you, I got ahold of Mrs. McFarlin. He gave me the number to get Mrs. McFarlin. I didn't even know it.

I called Mrs. McFarlin, and I said, Look, I don't know you, but I practice with Jay Longmire. He's not here. I just had this call from Mr. Watts, who is the Winfrees' attorney, as I understand. Mr. Watts has assured me that he has settled a lawsuit, the money is a certainty and will be there on Monday, not later than Wednesday, and that, in my opinion, the money's in the bank, a bird in the hand is better than one in the bush, and money is better than furniture.

And I said, If I were you, based on those assurances, I would release the execution.

Q. And did she authorize you to do that?

A. And she authorized me to do it.

At another point in his testimony he said:

Q. Did Mr. Watts give you any qualifications to that settlement?

A. None whatsoever, none, nothing. I mean, again, my direct impression from my conversation with Mr. Watts was, he said he had settled a jury trial lawsuit, that it was an insurance-type settlement, that the money, it was in State Court and the money would be there just within two or three days.

And again:

A. Let me, I think one time, in answer to Mr. Longmire, in one subsequent conversation I had with Mr. Watts, when he attempted to explain to me about this money coming from overseas, this was well after the money was supposed to have been there. That's when I got a little upset, I believe, because that never had been explained to me on that Thursday afternoon when he asked me to do this favor for him. And I think—that bothered me a great deal. those facts had not been made known to me at that time.

Based on the promise that the judgment would be paid by the middle of the next week, Ms. McFarlin released the execution.

However, the appellant in the federal court did not live up to his agreement. Consequently, Mr. Watts could not satisfy Ms. McFarlin's judgment. Her counsel then obtained a court order for Mr. Winfree to appear at a deposition on December 4, 1992 to answer questions about his assets. At 9:30 that morning he filed a claim of exemption listing items of furniture and other personal property amounting in value to $7350. Mr. Watts testified that he did not advise Mr. Winfree to make the exemption claims and that it was done without his knowledge.

In the meantime, on October 23, 1992, Ms. McFarlin sued Mr. Watts for negligent misrepresentation. Mr. Watts filed a third party claim for fraudulent misrepresentation against the law firm that represented the

appellant in the original federal case. After a bench trial, the circuit judge found Mr. Watts liable on the negligent misrepresentation theory and entered a judgment against him in the amount of $7,550.00. The court also dismissed Mr. Watts' third-party complaint.

## II.

The cause of action for negligent misrepresentation in this state is based on § 552 of the *Restatement (2d) of Torts. John Martin Company v. Morse/Diesel, Inc.*, 819 S.W.2d 428 (Tenn.1991). The cause of action is described in paragraph (1):

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

The principal requirements of the rule are that the information supplied must be false and the supplier must have failed to exercise reasonable care or competence in obtaining or communicating the information. As we read the transcript the only false information conveyed by Mr. Watts was a statement that the settlement was certain to occur or that Ms. McFarlin's money would be immediately forthcoming. Conceding that the information turned out to be false, what was Mr. Watts' negligence in obtaining the information? He had an agreement with another attorney to settle the federal case and a letter telling him that the funds would arrive early the next week. We do not think Mr. Watts violated a duty of care to Ms. McFarlin or her attorneys by relying on that representation and repeating it to induce them to release the levy of execution.

Ms. McFarlin argues that Mr. Watts had a duty to disclose that the settlement involved a federal case; that the defendant in that case was unreliable; and that the money had to be wired from overseas. The attorney with whom Mr. Watts spoke said that he "got the distinct impression" that the settlement had taken place in a state jury trial and that the money was being paid by an insurance company. He did not say Mr. Watts made that positive representation.

As to the duty to disclose the particulars of the settlement, we are not cited any authority that required Mr. Watts to do more than answer truthfully the questions he was asked. Mr. Watts did not stand in a fiduciary relationship to Ms. McFarlin or to her attorneys. His testimony is uncontradicted that he answered truthfully all the questions asked. The trial judge found as a fact that he was a truthful person, and that he did not say that the settlement was in a state court proceeding. We do not think the evidence shows Mr. Watts violated a duty to Ms. McFarlin.

## III.

We are also convinced that Ms. McFarlin would, at most, be entitled to nominal damages. There is no explanation in the record why she did not immediately have the execution reissued upon learning that the judgment would not be paid. Instead, on October 23, 1992, she sued Mr. Watts. She issued a notice to Mr. Winfree to appear for a deposition but he failed to appear. Still she did not reissue the execution before December 4, 1992 when the judgment debtors filed their claim for exemption. What Ms. McFarlin lost was the levy on the judgment debtor's furniture, which might easily have been obtained in a subsequent execution. It could hardly be argued that the loss was worth $7500.[1]

All parties apparently assumed that the judgment debtors had a $7500 personal property exemption and that the exemption could not have been claimed after the levy of execution. Since the debtors are not in bankruptcy, however, they would be entitled to the state personal property exemption of

---

1. Ms. McFarlin did testify that she had to pay $200 for a moving van to be on the site when the deputy sheriff served the levy.

$4000 provided by Tenn.Code Ann. § 26–2–102.[2] Whether the exemption could be claimed after the clerk issued the execution is still an open question. Tenn.Code Ann. § 26–2–114 says the exemption cannot be claimed after the execution issues; Tenn. Code Ann. § 26–2–407 seems to say that it can, but the Attorney General has issued an opinion that this section does not apply to the $4,000 exemption in Tenn.Code Ann. § 26–2–102. See OAG 90–89 (10–1–90). We do not attempt to resolve the dispute here because it is not necessary to do so. We merely point it out as bearing on the question of damages if Mr. Watts had been guilty of negligent misrepresentation. If the exemption could have been claimed after the execution issued, Ms. McFarlin would not have suffered a loss from releasing the execution.

For the foregoing reasons, we reverse the judgment of the court below and dismiss the claim against Mr. Watts. All other issues raised on appeal are, therefore, moot. The cause is remanded to the Circuit Court of Sumner County for the collection of costs in that court and for any other proceedings that may be necessary. Tax the costs on appeal to Ms. McFarlin.

TODD, P.J., and WILLIAM B. CAIN, Special Judge, concur.

2. We do not take a position on whether each of the judgment debtors, as husband and wife, would be entitled to claim separate exemptions in the same property.